All right. First case on the docket today is Pearson v. Bible Pork, Inc. Case No. 5-09-0308. Mr. Roth? Yes, Your Honor. May we proceed? You may do so. And before we start, it's my understanding, Mr. Bullock, you're the only one who's going to argue for the appellees. Is that correct? Your Honor, that's correct. Okay. All right. Justices of the 5th District Appellate Court, my name is Fred Roth. I'm pleased to be here before you today on behalf of the plaintiffs in the case Ruth Pearson et al. v. Bible Pork, Inc. This case is before you pursuant to our appeal. Two essential areas. One is asking for the court to review the granting of the motion for summary judgment. The trial court granted the motion for summary judgment on Count 2, which was the public nuisance claim. In our view, the court misapplied the Gilmore rule because in this case there were no standards with regard to air emissions from livestock facilities. The Gilmore rule pertains to highly regulated industries. The trial court made a finding that in its view that this industry is highly regulated. The Nichols v. Burnett case, the 2nd District Appellate decision, clearly said that it was an act, the Livestock Facilities Act, that was a miracle, that it was a dead letter. Well, the point here is that there are no regulations, state or federal, regarding air emissions from a livestock facility. Our case was based on odors. Odors being emitted from this facility that interfered with the neighbors. Neighbors who had lived there as their homes for as many as 75 years that were complaining about the odors as being a nuisance. The application of the Gilmore rule was incorrect. Absent the application of the Gilmore rule, we would have been permitted to go forward on the public nuisance action, which we were not. The second category on this appeal has to do with the denial of a fair trial. There are several mistakes that were made in the trial court that were prejudicial to the rights of the plaintiffs. The two most egregious had to do with the words, I will kill you. We had in a motion in limine an order from the court that the defendants would not be allowed to use those words, I will kill you, in testimony before the jury. Yet on a Friday afternoon at approximately 4 o'clock, the mother of the president of the defendant was allowed an answer to a question from their counsel to say, and quote the words as if coming from Ruth Pearson, the number one plaintiff, the words, I will kill you. We objected at that time, and we asked for a mistrial at that time, and the judge agreed with us that it had violated the motion in limine order that we had, but did not grant the mistrial, and instead merely instructed the jury to omit or to disregard those words. We cannot unring the bell on those words at that time in that situation. The second part is there was a police report that was attempted to be offered into evidence that was supposedly the words as dictated from Jan Bible, who did not testify as a witness, to someone in the police station who wrote them on a report, and then this report is brought to the courtroom as part of cross-examination of Ruth Pearson. When it was attempted to bring that up, we objected, and the court sustained our objection. Without the court's knowledge and without our knowledge as plaintiffs, there was an easel faced to the jury that only the jury could see that had five or six sentences supposedly attributed to Ruth Pearson. Let me ask you a question. How does the record reflect, or does the record reflect, that that easel was placed in such a position where only the jury could see it? It was at the next day, because I had found out the next morning at about 8 a.m. that it had been faced toward the jury by someone in the audience that approached me. I brought it to the court's attention, and the judge said that it's in the record. I didn't see any finding about it. We objected to it and asked for some relief on that. The other side said, we're going to bring in witnesses to prove up the evidence that's on that report, which they never did. The judge said, well, we'll see, and if there's a problem, we'll deal with it later. There seems to be some dispute about how the easel was positioned in the briefs anyway. My question is, how can we ascertain from the record that it was positioned in such a way that the jury could see it? Well, on the record, both myself, testimony to the court, said I never knew it was there, never saw it, and the judge said in response, I didn't know it was there either. I never saw it, and yet they were allowed to ask questions based on each sentence while the jury's looking at this, in which Ruth Pearson was saying, I did not say that. There was no voir dire of the jury in any way to determine whether they'd seen it during this trial? No. It was admitted by counsel for the defense that it was in the easel and it was facing that direction. That was admitted in the transcript on that particular part, and we did attach a copy of that transcript to our appellate brief. It is attached to the Exhibit No. 4. Where on the record, H.C. 1220 and 1221, where the court said it wasn't displayed so the jury can see it, and Mr. Custer, yes, it was. So it's their statement saying it was placed in a position so the jury could see it. So what we have is someone on the stand who's being asked sentence by sentence about something that's on a police report that says Clay County Sheriff is facing the jury, while she's saying, I never said that statement. They read the next one. I never said that. And the jury's being allowed to watch that statement, which had specifically by the judge been denied or our objection to introduce that document had been sustained. The judge went further to say he didn't even realize there was a demonstrative exhibit. But he thought it was a piece of paper, which was a copy of an 8-and-a-half, 11-page copy of the report that we discussed in the sidebar to get the objection sustained. In addition, there were ongoing efforts on the part of the plaintiff to put the complete story and information and evidence regarding this facility into the record. And one in particular had to do with the use of air scrubbers. Our case was not, as the judge said, about Jobs versus Ruth Pearson's nose. And there's nothing to substantiate that kind of analysis on the court's part to say that this is just a case about money to the county, Jobs versus her nose. And if it is about that, then our nose is much more important. As I responded in my reply brief, that the Supreme Court has repeatedly held that when it comes to pecuniary advantage versus nuisance and interference with someone's rights in a private nuisance case, those override the pecuniary aspect. Well, in regard to this facility, part of our case was to show that this was a temporary nuisance that could be abated to the point that it was not a nuisance. And part of that was either treat the manure or treat the air. And air scrubbers was a valuable part of that. But the SCO air system, which they put in as one of the first facilities to put it in, pipes up the air in these flues that go up to the ceiling. What they refused to let in, and the court would not let in, is the same company makes a scrubber that attaches to the top of those vents to scrub the air before it goes out and is dispersed in the community. That was denied on the argument that even though it was talked about in the discovery deposition of Mark Miner, one of our experts, he was not allowed to testify about that at the time of trial. Three other quick areas to touch upon is that Ruth Pearson had at one time become upset with Matt Bible and the defendants. Because of the fact that at the time he was building this facility, he was also building a brand new house. And he had publicly stated that he had lived next to such a facility, while the facility he lived next to was a fraction of the size. And he wasn't explaining to people in the community that he was building a new house three miles from the other side of town. In connection with that, she had discovered that discrepancy of the size and the location and the placement of his new house and approached him on that. We tried hard in a motion to eliminate to allow that evidence of what he was doing, and the court said the house had nothing to do with it. But our evidence included the fact that that house was built by the same company funds, the defendant, Bible Cork, Inc., paid for that house. He lived there rent free. It was done during the same time period. And he had plenty of property right next to the facility to place that house or place it in another location. He placed it in another location, but we couldn't, we weren't allowed to introduce that because the court thought it was too prejudicial. The placement of the house that the facility owner had built and financed 100% of their cost. Last part is, they brought on evidence about what was going on inside the facility. We wanted to bring in pictures of the inside of the facility, and we wanted a site visit to give the jury an understanding of how massive this facility was. The court allowed them to testify how carefully they controlled the environment and took care of the pigs to give this almost scientific clean room atmosphere to the testimony. We weren't allowed to show the pictures that we had taken on a court approved inspection of the facility to give the jury a true idea of how massive this facility was. With the excuse that somehow we were going to draw upon the insensitivity or the sensitivity of the jurors for the inhumane treatment of animals, which was not our purpose. And they had nothing to show that because when they did the initial questioning of all the jurors, none of them even really knew what PETA or any of those organizations were. The people that brought this case were neighbors that had lived there an average of 30, 40, 70 years. That they themselves were older, that they themselves had their homes interfered with by these owners. This wasn't a city versus country. In particular, the Bailey's, they had raised hogs and they lived a mile and a half away. Mr. Bailey, who was in his 70s and is still farming full time with his wife from their family farm, he testified about the dramatic impact of this odor on him when he had to go outside. The same is true of the other plaintiffs, which are all uncontradicted by anyone from the other side. The point about the experts. Our experts, for a brief time period of about 26 days, did do some testing. It was merely to show that the source was this facility, which had come into the neighborhood. That it wasn't coming from oil wells that were somehow not properly closed or capped. It wasn't coming from household products. It was coming from this facility and the tracing was done for a brief time period. When Ruth Pearson testified, in addition to Terry Wolfe, who is the closest living to this, as well as the scuvenor, Dorothy Scuvenor, who had lived at her house for 75 years prior to this event, there was a detailed log that was logged in from all of those three different locations. When this log is compared with the tracing that was done in the 26 days, what it shows is on the days when they were finding odor, there were some trace elements of both ammonia or hydrogen sulfide. It wasn't that we had the equipment to test for odor. Odor is based on other DOCs, they call them, that has nothing to do with hydrogen sulfide and ammonia or the concentration of that. In fact, some people believe ammonia in its pure form is not even detectable except if it's an irritation. They tried to make the argument that our experts somehow killed the credibility of our witnesses. Exactly the opposite is true. What killed the credibility of us before the jury was the personal attacks on Ruth Pearson, as I call it, the food coloring impact, where we had all of this good, solid, verified information from our 15 plaintiff's witnesses about the odors, about the impacts, about how often it occurred, and it was all destroyed because of this vindictive attack to say that Ruth Pearson was not telling the truth because of the use of that. It was the I will kill you comment that was allowed in after it was specifically ordered not to come in, and our inability to bring in evidence because of the court's rulings that we could not show the complete status or the impact of this facility and its size upon the neighbors. In the end, we somehow found ourselves in a courtroom where the court didn't understand the law of nuisance in an application of the Gilmore standard, who himself repeatedly made comments that we want the appellate court to know. The comparison of hunting, which is highly regulated, to the air emissions from this facility, which has no regulations. In fact, we pointed out to the court that, ironically, this case started January 20, 2009. It was on that date that the exemption from reporting for over 100 pounds a day of ammonia, which this facility was at 426 pounds per day of ammonia, according to our experts, that the federal EPA had changed the rule affecting January 20, 2009, the start date of our thing, to say that if you have a livestock facility that's producing over 100 pounds of ammonia, it's not a reportable event. But if you have a grain operation on the same farm and it has a bursted tank and throws out 101 pounds of ammonia, you must report that within 24 hours. It's questionable how the EPA could even come up with such an exemption, but they did. And it became effective the day our trial started. And that was the last remaining possible reporting requirement or EPA requirement in the country to deal with anything with the air emissions from this facility. It was their expert on environmental matters, Timothy Latch, who testified in cross-examination that there are no air emission standards whatsoever, state or federal, that apply to this facility. The last gasp for clean air or not to be impacted by these odors, which are outrageous, is in this courtroom for these plaintiffs. They brought this action because of how it impacted them. They went through, as they pointed out, over 34 depositions. They went through having their houses impacted by coming in and looking at every household product, claiming that might be the source of the odor. The odor source was proven. The impact over time was there. The judge's comments in the post-trial motion to say, but you sued them even before it started, showed how far he had missed the point. The Nichols case itself was an action started and confirmed by the Second District Appellate Court under good Illinois law, that you can bring these actions even before the facility starts operations. But it shows some level of misunderstanding or prejudice to even say that. And in his post-trial judgment hearing, he never even addresses the easel in Exhibit 16 and the fact that the jury was seeing something that was in direct contradiction. That particular circumstance is even more egregious when we think about the fact that this was a phone call to a voicemail service on a machine. That it supposedly played on a machine and then dictated over the phone to a police clerk who typed it into a report, who gave that report to the defendants, who brought that report into court, who were stopped from showing it on a piece of paper to the defendant, I mean the plaintiff, Ruth Pearson, but then put it on an easel and began saying each line of what's in that report, did you say this? And she testifies, no, I didn't. The person who took it off the recorder was Jan Bible. They withdrew her as a witness. She never testified as to her taking it off. The clerk or anyone from the sheriff's office, despite depositions, never came in as a witness to testify. Yet when Matt Bible was on the stand trying to testify about that as coming from his wife Jan Bible, I objected on the basis that there was hearsay for him to be talking about it from his wife. And he was allowed to go ahead and talk about it because the court, in some way, fashion, thought because she had denied it, Ruth Pearson had denied saying this, he had a right to talk about it. They never proved this up. There was no foundation. There couldn't be. The court in prior decisions in Illinois has made it clear that police reports are hearsay and prejudicial to the rights. Thank you. Thank you, Mr. Rothfeld. We have a chance for a rebuttal. Mr. Bullock, you may proceed. Good morning, Your Honor. Thank you. May it please the court, I'm Alex Bullock here on behalf of Bible Court. This case, in this case, the plaintiffs are now complaining that they were somehow denied a fair trial. The fact that the record before this court is clear that the plaintiffs had a full and fair opportunity to make their case for private nuisance. They were unable to do so despite drafting three complaints, 50 depositions, over 1,200 pages of trial testimony from all of the plaintiffs. The jury's verdict was based and supported by the overwhelming weight of the evidence that Bible Court for the facility at issue in this case is not a private nuisance because it does not interfere with the use and enjoyment of the plaintiff's property. The plaintiffs were unable to make that case in the trial. Now appeal, the plaintiffs argue that because Bible Court challenged one of the witnesses, that that somehow denied or lightened the testimony of the remaining plaintiffs in the case. The jury had an opportunity to hear all of the plaintiffs' unimpeded testimony to make their credibility judgment. The jury did so and found on behalf of Bible Court. The evidence from the experts on both sides that we'll talk about in a minute, plus the testimony of neighbors who didn't have a dog in the fight, supported the jury's verdict and was credible, competent, unbiased evidence that the facility does not interfere with the use and enjoyment of property. Let me turn first to the question of demonstrative age 16. Along with all the other demonstrative exhibits in this case, as the court has seen from the record in this case, there were a number of demonstrative exhibits. This demonstrative age 16 was shown to counsel prior to the trial. It was placed on the easel. It's not a police report. It's a transcription of a police log. It's a copy of a police log, which is a transcription of a voicemail message left from Ms. Pearson. It was placed on the easel. The easel was in the same location that every other demonstrative age had been placed. The entire trial, visible to the jury, visible to the court, and that when the… Why would you leave an exhibit open to the public that had not been admitted into evidence? Your Honor, it was a… Even for demonstrative purposes. No witness had identified it. You had it marked, I take it, this exhibit. That's correct, Your Honor. But no witness had made reference to it. You hadn't used it in an opening statement. Why would it be left visible to the jury? We were in the process of doing that, Your Honor, with Ms. Pearson's testimony.  And that… But then you chose not to use it with that witness. Well, we were taking the witness through… It was a blog of what was going to be otherwise an Exhibit 16. And we took the witness through that particular, the statements that were made, the legislation that had been made in that report, in the statement. The plaintiffs objected at that time, and that objection was overruled. The objection to hearsay was overruled because it's an admission of the party opponent. Ms. Pearson denied making some of those statements. Subsequently, the next day, we took Mr. Bible through those statements, and he actually heard the voice message, so he was competent to try to lay that foundation. At that point in time, the plaintiffs had raised that issue, and we took the exhibit back down. Okay. There is no citation to brief to the record. The only objection that the plaintiffs made was that the hearsay during Ms. Pearson's cross-examination, that objection was denied. It would be our contention that they have waived any other argument. Had there been a pretrial ruling on that Exhibit 16? There had not been. All right. So it had not been barred on any motion in limine or anything like that? That's correct, Your Honor. Turning now to the issue raised about the scrubber opinion of the Plaintiffs' Expert, Bart Lanham, Rule 213 requires the disclosure of all the opinions in the case. If the opinion was not in the disclosure or report, then the plaintiffs have the burden of carrying to show that it was covered in their deposition. Mr. Lanham was not identified as an expert on scrubbers. His opinion, to the extent that it was opinion, he acknowledged he merely provided edits to Dr. Lou Hing's report, expressed no opinion about scrubbers. At his deposition, I asked him if he had any additional opinions other than what was in his report or what he had testified to during the trial. He said no. The only reference he made during the deposition of scrubbers is that he had worked in two facilities that had scrubbers, but he had never been identified or qualified as an expert on scrubbers. Accordingly, we believe that it was proper for the judge to exclude any surprise evidence or surprise questions regarding scrubbers under Rule 213. That's the reason the 213 exists, to prevent these kinds of surprises at trial. The plaintiffs have raised a question about whether or not they should have been allowed to discuss the location of Matt Biola's home in this matter, which seems to be a strange question to go off in this case. But the reality is, the plaintiffs argue that Ms. Pearson did not have a full and fair opportunity to explain why she was angry regarding the construction of Bible IV. That's not correct. As the record indicates, Ms. Pearson had an ample opportunity to explain to the jury her concerns. Her concerns were that Matt Biola was saying that Bible IV would be of a similar size to his currently existing facilities. She did calculations on her own and determined that in fact, her belief that those facilities were not the same size as Bible IV. So she had an opportunity to explain to the jury the basis, and in great detail the record shows that she did explain the basis, of why she was upset. What's interesting is that the plaintiffs could have asked and made an offer of proof with Ms. Pearson about what else she would have added to that. In fact, they did not. They made an offer of proof during that Bible, and as the court said after hearing Mr. Biola's testimony, it was more convinced than ever that it had made the correct decision. As your honors know, trial courts are granted substantial discretion on the admission or exclusion of evidence, and in this case, the key evidence regarding the core of Ms. Pearson's concerns were, she was allowed to testify to the jury, but this is not the complete doctrine as the plaintiffs argue under Illinois law. That's regarding whether or not a complete statement, or a complete reading of a particular section of a document. In this case, there wasn't a document, and Ms. Pearson was able to fully explain what it was, the nature of her concerns about Mr. Biola's calculations. In fact, when the offer of proof was put forward by the plaintiffs, Mr. Biola's cross-examination proved that, in fact, the two facilities to which he was referring, his older facilities, were, in fact, of a correlation there next to each other. They did, in fact, were of equivalent size to Bible IV, so his original statements were correct, and he was able to explain that to the court. Plaintiffs have also raised the question of whether they should have been allowed to have a site visit. As a fundamental matter, the plaintiffs' argument is really kind of a misleading argument in terms of what's at the core of this case. We were trying a case on private nuisance, which is an unreasonable interference with the use and enjoyment of a plaintiff's property. The plaintiffs didn't want to go to their own houses. They didn't want the jury to see what it was like at their own residences. What they wanted to do was take them to the facility. In reality, the question is not what conditions there are around the facility. The question is, what is the condition or level of conditions at the plaintiff's own homes? And the court was correct. It's our contention in not granting a site visit, given the difficulties, the logistics, and the fact that it's really not the competent evidence. The competent evidence had the plaintiffs ask for it, and they had been to go to the individual houses. However, they didn't ask for it. Let me turn now to the issue of summary judgment. The plaintiffs have argued that the trial court's granting of summary judgment on a public nuisance claim was incorrect. In fact, I think that the Lifestyle Management Facilities Act is exactly the type of comprehensive regulatory scheme that the Illinois Supreme Court envisioned in Morel when it was thinking about whether or not a lawful activity could be the subject of a public nuisance claim. Public nuisance is a doing or failure of doing of something that injuriously affects the health and safety and morals of the public. Lawful activities can be public nuisances. The difficulty that I think the court was analyzing in Beretta is how do you do that balancing test? Is there some type of scheme that says this particular party is engaged in a lawful act, they're permitted to do this, and how do you balance the public right? And the answer is that they came up with using the Gilmore test, expanding it, to establish whether or not the defendant violated the applicable statutes of the regulation, the defendant was otherwise negligent, or the law was invalid. The plaintiffs have admitted that there's no violation of the LMFA in this case. There's no negligence in this case. And that the LMFA remains valid. Now, plaintiffs have cited the Nichols case for the argument that somehow the LMFA is, in the words of Nichols and the plaintiffs, they use it chimerically. Nichols, however, is really an opposite in this case for several reasons. First of all, Nichols was really criticizing, in its view, the fact that even though there was a comprehensive regulatory scheme in place in the LMFA, and Nichols uses that phrase, comprehensive regulatory scheme, that it did not then preempt these types of cases. The other complaint that it had is that, in its view, there were no mechanisms in the statute to assess penalties. So, therefore, it was, in the court's words, toothless. Well, the reality is, with all due respect to the Nichols Court, there are a substantial set of penalties and fines that can be levied under both the statute and the accompanying regulations. Failure to have livestock managers who are certified in the facilities Failure to meet construction plans Failure to meet construction standards Failure to meet the state's rivers, lakes, and streams All of these can be penalized with fines and or injunctive relief. To the extent that a facility such as Bible IV, someone has invested the millions of dollars that's necessary to build these facilities, injunctive relief in and of itself is a substantial penalty. Any of those regulations or statutes you just mentioned have anything to do with the odors that are being emitted from the facility? They do, Your Honor. And that goes to the heart of one of the reasons why the LMFA was passed. And if you look at the preliminary portions of the statute, the legislature acknowledged that the livestock industry in the state was growing. There would be issues regarding odor. And those regulations deal in terms of where these facilities are placed and the setback requirements related to the particular size of the facility, specific setback requirements as for specific sizes of the facilities. All of those are legislative, specific legislative intent to balance how odors from the facility would be balanced against the state's interest in having a viable and vibrant livestock facility. So based on the size of the facility, there are odor issues that are dealt with. Secondly, there are specific penalties for violations of specific requirements related to the application of manure that's used as a fertilizer in the fields within certain distances from any home. It has to be ejected. There are requirements in terms of if it's at other locations, whether it has to be ejected or incorporated in the soil within a certain period of time. So the legislature clearly took these issues into account in balancing odor interest versus the interest of the facility itself. The plaintiff's argument is, well, it doesn't regulate one particular element of one aspect of these facilities. And it's almost looking backwards up through the microscope. Reality is there is an overall scheme that attempts to balance all of these issues and it regulates those in a variety of ways and puts teeth in a failure to do so. For example, with the setback requirements, if you don't meet them, the injunctions can shut you down. The one other issue about whether or not the issues of Ruth Pearson's statement about I will kill you, in the overall context, it's important to note that by the time that Carolyn Bible had testified, Ms. Pearson had already admitted to making those statements to the jury.  on cross-examination and Mr. Bible had testified on cross-examination. That she had made those statements in her presence. So the fact that the words I will kill you, I will destroy you, came out were not in violation of the court's order. The court did not say those words could not be said. The court said in its ruling on the motion of limine, it was not going to allow I will kill you in the sense of the defendants were trying to prove that basically the court said if you want to say I will kill you, I will destroy you financially, that was appropriate, that was admissible. And that's what Ms. Bible said. However, those statements were already admitted to by Ms. Pearson. So there's no error or harm done to the plaintiff's case. Let me, in my time remaining, there are a number of affirmative reasons why this jury's verdict should be affirmed. The overwhelming weight of the evidence supports the jury's verdict. As the judge said, based on his observation of the evidence, it was exactly the right verdict based upon the evidence. The jury heard from a variety of witnesses. The jury heard, the plaintiffs continued to make the argument somehow that we did not have the opportunity or that we did not take advantage of any opportunity to somehow contradict any statements made by the plaintiffs. The reality is the scientific evidence in fact did contravert the plaintiff's statements. The plaintiffs had the opportunity to go out and test for whatever chemicals they wanted to test for to determine whether or not, not only whether the Bible 4 could be the source of some of these emissions, but again, going to the root of the issue, whether or not there were emissions from the facility, whether or not there were odors from the facility that were interfering unreasonably with the use and enjoyment of the plaintiff's property. The plaintiff's own experts did, conducted error monitoring activities. They provided in an Excel spreadsheet form all the results of their testimony. The jury was able to see when we put it on screen as we were cross-examining the plaintiff's own experts that less than 1% of the time any odor from hydrogen sulfide or ammonia were getting to the plaintiff's homes in a level that they were able to smell. In addition to that, we were able to present our testimony from Steve Davis and Dwayne Bundy showing that not only the actual monitoring showed that very few of any of these emissions were coming to the plaintiff's houses in levels that they could smell of, the error modeling in which how often air flow came from the facility to these individual plaintiff's homes actually was the equivalent of what the error monitoring was showing. So the plaintiff's had no answer to that. If you combine that with non-party witnesses such as Chet Allen, the McGee family, Dr. Blair, Mr. Blair, for example, who lived in the neighborhood 60 years, all those support very much. Can I ask you one question? Sure, go ahead. These tests that they conducted to detect the odors, they're recognized within the expert community as being valid. That's correct. Now, are any of these tests in connection with the summary judgment, are any of those tests ever required by any Illinois statute or federal statute in connection with these facilities? In terms of particular air monitoring? Yes, on a regular basis. As to being a highly regulated industry, are any of these tests required? Not to my knowledge, Your Honor, because the, for example, in the Clean Air Act, ammonia is regulated by the Clean Air Act. If it's over a certain level of emission, I believe that I can give you that particular reading for ammonia. But the reality is the reasons that they're not required is because EPA recognizes that once they leave the facility there at such an infinitesimal level, that there's no requirement for them. Okay. I appreciate it. Thank you. Thank you. All right. Thank you, Mr. Bullock. Mr. Roth, any rebuttal? Mr. Roth, you've got overcome a jury verdict. We all know the standard of review is being against the manifest way to the evidence. Six neighbors, I think, was mentioned testified that this was not a problem. Why couldn't the jury just simply rely on that testimony? Well, the first neighbor that testified, as we pointed out in our reply, was very biased and not independent. His father had been promised cheap fertilizer in the way of manure from the facility. He was contradicted in his testimony about signing a petition that he claims under oath that he didn't read before he signed it. And later the person who presented it to him, which was one of the plaintiffs, Terry Wolf, who had been his first grade teacher, testified how she drove her four-wheel drive ATV over to see him and sat down and went through everything and read it with him before he signed it. So there was not an unbiased independence. So, I mean, you don't have to go through each witness, but you're telling me all six of those, the jury couldn't watch their testimony, find them to be credible, and base their verdict on that evidence. Well, for more than just the reason of the lack of independence and bias that we would go through, but the fact that there's 20 of us in this room and 10 are bothered and the other 10 aren't doesn't mean that just because certain people are not bothered by this odor and don't live in the same location. That's true, but the jury has got to decide this case. And our standard of review is not what, we're not sitting as a jury. We're only reading the cold transcript and they found based on this testimony that it wasn't a private nuisance and in part it was based on these other neighbors. But go ahead. Yes, and in fact the defendants themselves claim that the odors that come from the facility are not offensive either based on where they're at. So there is, it's not that there isn't other evidence that contradicts, but our evidence was so mortally injured in terms of the circumstances. To give you a further illustration, when it was talked about this testimony regarding the voicemail issue, which is the demonstrative Exhibit 16, the question to Mr. Bible, when he took the stand, how did you know it was Ruth Pearson when you played the message back on your telephone? Answer, she said, Hi, Matt. This is Ruth Pearson. Question, do you recall what she said in that voicemail message? Mr. Roth, objection, Your Honor, I believe this is hearsay. He didn't hear Ruth Pearson herself. He's referring to a voicemail. Mr. Custer, that goes away. It's a recorded statement made by a party, which is the jury. Now this is after they already had Ruth Pearson on the stand. It's after they had the demonstrative exhibit that only the jury was seeing and not the judge and not the plaintiff's counsel going through all those statements. The court said this is impeachment of her testimony. Mr. Custer, it's an inconsistent statement. That's correct. Court, overruled. Mr. Roth, she has not testified as to leaving any voicemail. The court, yes she did. In fact, she denied it. Overruled. Go ahead. The court is saying she denied leaving that voicemail, yet lets the testimony come in as to what Mr. Bible remembered. So Mr. Custer, continuing, says do you remember what Ms. Pearson said in the voicemail message? Answer, yes, I remember a few sentences. She said this facility will cost you a lot and I know the law and I know how to work the system. Those are the main things that she said. That's not with any foundation that should be accepted. The court says, yes, it's going to be a prior inconsistent statement because she denied saying it from a voicemail that he's paraphrasing from a stand, which they introduced in cross examination asking her if she did certain things, having put this before the jury. How many plaintiffs were there when you went to verdict? Was it 15? How does that prejudice that you're arguing here about Ms. Pearson apply to the rest of these plaintiffs? All of the rest of the plaintiffs had testified and two or three of them testified to these odor laws. Ms. Pearson was our last fact witness who brought it all together. She was the principal witness bringing this all together and pointing together the spreadsheet and the odor laws of the different ones that were all combined into one odor law and showing frequencies and so forth. She was the one who was the lead plaintiff as they considered. She's the one they